UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TIMOTHY CARR,<br><br>          Plaintiff,<br><br>v.<br><br>TOWN OF BOURNE BY ITS BOARD OF<br>SELECTMEN, CHIEF OF POLICE OF<br>THE TOWN OF BOURNE, POLICE<br>OFFICER TIMOTHY DERBY, POLICE<br>OFFICER KYLE TRINGALI, NEW<br>ENGLAND SECURITY PROTECTICE<br>SERVICES AGENCY, INC., and<br>JAMES GRACIE,<br><br>          Defendants. | No. 21-cv-11808-DLC |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Cabell, U.S.M.J.

## I.   INTRODUCTION

This action arises from an early morning encounter between Bourne Police Department (BPD) officers Timothy Derby and Kyle Tringali ("the officers"), security guard Joseph Grace ("Grace"), and plaintiff Timothy Carr ("Carr" or "plaintiff"). Carr contends that the two police officers, responding to a call from Grace, forcibly entered his office without cause and confronted him with their weapons drawn. The operative complaint asserts various claims against the officers, the town of Bourne (the "Town"), and

the BPD Chief of Police (the "Chief of Police")[1] (collectively "the defendants").[2]  The defendants move for summary judgment on all counts.  (Dkt. No. 37).  For the reasons that follow, the court grants the defendants' motion.

II.  **BACKGROUND**

A.  **Facts Leading Up to the Police Encounter**

The parties do not dispute the salient facts leading up to the officers' encounter with Carr.

Carr at all relevant times rented an office located at 1248 Route 28A, Unit 9,[3] in Cataumet, MA.[4]  (Dkt. No. 39, Defendants' Statement of Material Facts, ¶ 1; Dkt. No. 1-2, ¶ 7).  Early in the morning on July 21, 2018, Carr's personal vehicle was parked in the adjacent parking lot, with a boat on a trailer attached to the vehicle.  (Dkt. No. 39, ¶ 3).  Carr suspected that his boat had a mechanical problem, and he was planning to fix it before going fishing later that morning.  (*Id.*).

---

[1] Carr does not indicate whether he is suing the Chief of Police and the officers in their official or individual capacities.  The court will presume it is both.

[2] The court previously entered summary judgment against Grace and his employer on the sole claim of trespass advanced against them.

[3] Though Carr's office is identified as "Unit 3" elsewhere in the record, including the defendants' Statement of Material Facts (Dkt. No. 39), Carr repeatedly referred to his office as "Unit 9" during his deposition.  The discrepancy is immaterial, but the court assumes the plaintiff's description is accurate.

[4] Cataumet is a village within the Town.

At approximately 2:30 am, Carr left his office to "park [his work vehicle, which was also in the parking lot] in a more convenient spot so it wouldn't be in the way of anybody." (Dkt. No. 38-1, Transcript of Carr's Deposition, p. 47:10-13). As he left the parking lot, Carr was stopped by Grace, a private security guard, who questioned Carr regarding his identity and purpose for being on the property. (*Id*. at pp. 47:15-21, 151:9). After speaking with Grace for approximately five minutes, Carr parked his work vehicle and returned to his office. (*Id*. at p. 52:14-24). Back in his office, Carr sat on a chair observing Grace walk around the property with a flashlight. (Dkt. No. 39, ¶¶ 5-6).

Grace subsequently called the police, and the officers arrived at approximately 3:15 am. (*Id*. at ¶¶ 4, 8). The officers and Grace searched the parking lot and the area around Carr's office with flashlights while calling out Carr's name (*Id*. at ¶ 9). Carr watched from inside his office. (*Id*.).

Approximately ten minutes after the officers arrived, the door to Carr's office opened. (Dkt. No. 38-2, Security Camera Footage, at 03:25:16). The parties dispute who opened the door, as well as the details of their encounter, but they do agree that: (1) the officers never handcuffed or touched Carr in any way; (2) the door and lock to Carr's office were not damaged; and (3) a nearby security camera accurately captured video footage of the encounter. (*Id*. at ¶¶ 12, 14, 16). The encounter lasted less

3

than two minutes.  (*Id.* at 03:25:16-03:27:58).  After the officers and Grace left Carr's office, Carr followed them out into the parking lot. (*Id.* at 03:28:26).

**B.   The Parties' Accounts of the Encounter**

The defendants assert that Carr (and not the officers) opened the door to his office.  They also assert that the officers "did not forcibly break into Carr's office or draw their firearms." (Dkt. No. 38, p. 8).  They contend that the officers spoke with Carr for approximately two minutes and then walked away after determining there was no crime in progress, followed shortly thereafter by Carr.

Carr asserts that someone, either the officers or Grace, forced his locked door open after pulling on it roughly 20 times. (Dkt. No. 38-1, p. 59:8-9).  Carr further maintains that one of the officers entered his office and in doing so pointed both a firearm and a flashlight at Carr.  (*Id.* at pp. 62:19-63:1; 159:12-160:5; Dkt. No. 41, ¶ 4, Memorandum in Opposition).  Carr believed the officer was holding the firearm in his right hand.  (Dkt. No. 38-1, p. 159:16-18).

**C.   What the Video Shows**

The parties agree that a security camera outside Carr's office captured much of the incident and that the recorded video accurately depicts what happened.  (Dkt. No. 38-2).  The video in pertinent part begins with Grace walking around the area outside

Carr's office.  When the officers[5] eventually arrive, one of them,
Officer 1, briefly attempts to open the door to Carr's office by
trying the handle.  (Dkt. No. 38-2 at 03:25:02-03:25:14).  The
door appears to be locked and Officer 1 begins to turn and walk
away.  (*Id.* at 03:25:13-03:25:15).  As he does so, something --
perhaps a sound, although the video does not reveal this -- appears
to catch his attention, and he turns back to the door.  (*Id.* at
03:25:16).  Officer 1 then grasps part of the door, several inches
above the handle he had just tried, and pulls casually.  As he
does so, the door opens.  (*Id.* at 03:25:17-03:25-21).

Once the door is opened, Officer 1 steps back and Grace moves
to hold the door open.  (*Id.* at 03:25:18-03:25:21).  The other
officer, Officer 2, then enters the frame and approaches Carr's
office, holding a lit flashlight in his right hand.  (*Id.* at
03:25:15-03:25:23).  As Officer 2 arrives at the threshold to
Carr's office, he lifts his right hand and points his flashlight
into Carr's office.  (*Id.* at 03:25:24).  In the same frame, Officer
2's left hand is briefly depicted, and it is empty, meaning he is
not holding a firearm in either his left or right hand.  (*Id.*).
Officer 2 then proceeds to lean into Carr's office to speak with

---

[5] Although the two officers are identified by name in the complaint, nothing in
the record clarifies what role each officer played.  At oral argument, counsel
was unable to shed light on which officer depicted in the video was Officer
Derby and which was Officer Tringali.  Accordingly, the court refers to the
officers as Officer 1 and Officer 2.

Carr, obscuring his torso for approximately sixteen seconds.  (*Id.* at 03:25:27-03:25:43).

Following that period of time, Officer 2 leans back slightly, making the beam of his flashlight (held in his right hand) visible again for a few seconds.  (*Id.* at 03:25:47-03:25:50).  Officer 2 then turns his flashlight off, places and secures it behind his back, and brings his empty right hand in front of his body, where he uses it to gesticulate as he speaks with Carr.  (*Id.* at 03:25:50-03:26:09).

From then on, Officer 2 never brings his flashlight out again.  (*Id.* at 03:26:09-03:27:59).  As Officer 2 steps away from Carr's door, both of his hands are clearly empty.  (*Id.* at 03:27:49-03:27:58).  At no point is Officer 2 shown brandishing a firearm. Likewise, Officer 1, who is clearly visible throughout Officer 2's interaction with Carr, never brandishes a firearm.

## III. <u>THE COMPLAINT</u>

The operative complaint asserts four claims, all of which arise in part or entirely from Carr's allegation that one or both officers forcibly entered Carr's office without cause and with weapons drawn.  Count One alleges a violation of 42 U.S.C. § 1983; Count Two alleges common law assault; Count Three alleges trespass; and Count Four alleges negligent or intentional infliction of emotional distress.

6

IV. **LEGAL STANDARD**

The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) (citation omitted). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if it can be 'resolved in favor of either party,' and a fact is 'material' if it 'has the potential of affecting the outcome of the case.'" *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (quoting *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016)).

The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). If the moving party satisfies its initial burden, the opposing party then "bears the burden of producing specific facts sufficient to defeat summary judgment." *González-Cabán v. JR Seafood Inc.*, 48 F.4th 10, 14 (1st Cir. 2022) (internal quotations omitted). The opposing party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Clifford v. Barnhart*, 449 F.3d

276, 280 (1st Cir. 2006) (internal quotation omitted).
Furthermore, "[the] evidence illustrating the factual controversy
cannot be conjectural or problematic; it must have substance in
the sense that it limns differing versions of the truth which a
factfinder must resolve." *Mack v. Great Atl. and Pac. Tea Co.*,
871 F.2d 179, 181 (1st Cir. 1989).

When reviewing a motion for summary judgment, the court views
the facts "in the light most favorable to the non-moving party."
*Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 125 (1st Cir. 1999).
However, "[w]hen opposing parties tell two different stories, one
of which is blatantly contradicted by the record, so that no
reasonable jury could believe it, a court should not adopt that
version of the facts for purposes of ruling on a motion for summary
judgment." *Underwood v. Barrett*, 924 F.3d 19, 20 (1st Cir. 2019)
(per curiam) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)).

## V.   DISCUSSION

The evidence in the record comes principally from two sources,
Carr's deposition testimony and the security camera video footage,
and each source paints a starkly different picture of what
transpired.  But where, as here, the parties agree the video
footage is authentic and accurate, the court views the facts in
the light depicted by the video evidence and will favor the video
evidence wherever it blatantly contradicts any portion of Carr's
deposition.  *See O'Brien v. Town of Bellingham*, 943 F.3d 514, 531

(1st. Cir. 2019); *see also Underwood*, 924 F.3d at 20 (court "should not adopt [blatantly contradicted] version of the facts for purposes of ruling on a motion for summary judgment").

### A.   Count One – Violation of 42 U.S.C. § 1983

Count One alleges a violation of 42 U.S.C. § 1983.[6]  Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).  To prevail under section 1983, a plaintiff must among other things show that the defendants deprived the plaintiff of a right secured by the Constitution or the laws of the United States. *Budnick v. Baybanks, Inc.*, 921 F. Supp. 30, 32 (D. Mass. 1996).

The plaintiff does not articulate with particularity what constitutional right was impacted here, alleging broadly that the officers' conduct deprived him of "the rights, privileges, and/or immunities guaranteed to him under federal law and/or the U.S. Constitution." (Dkt. No. 1-2, ¶ 28).  That said, the court presumes, and the defendants appear to agree, that the plaintiff alleges that the officers violated his Fourth Amendment right to be free from an unreasonable seizure by forcibly entering his

---

[6] The complaint styles Count One as arising under both 42 U.S.C. § 1983 and M.G.L. c. 258, the Massachusetts Tort Claims Act (the "MTCA").  The MTCA sets out the requirements and limitations for asserting a state law tort claim against a governmental authority but does not itself provide for an independent cause of action.  The court thus treats Count One as asserting solely a claim under 42 U.S.C. § 1983.

office without cause and with weapons drawn.  See U.S. Const. amend. IV ("[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . .").[7] Based largely on the video footage, the court finds that the officers did not commit the acts alleged and thus did not violate Carr's Fourth Amendment rights.

To begin, Carr contends that the encounter began with Officer 1 trying at least 20 times to pull Carr's locked door open before forcibly gaining entry (along with Officer 2) into Carr's office. However, the video shows beyond any doubt that this just did not happen.  Rather, Officer 1 briefly tried the door handle but then turned away when the door did not open, and then turned back towards the door in response to something, most likely the sound of the door being unlocked.  Officer 1 then grasped part of the door, several inches above the handle he had just tried, and pulled the door open casually before walking away and leaving Grace to hold the door.  As such, whether it was Officer 1 or Carr who

---

[7] The plaintiff does not articulate a specific theory of liability with respect to the Chief of Police or the Town.  He does not allege, for example, that the officers were negligently hired, trained, or supervised, or claim municipal liability against the Town for officially sanctioning the officers' conduct through some Town policy or practice.  *See  Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  As explained below, the failure to do so does not matter here where the court goes on to find that the officers did not violate the plaintiff's rights, rendering any derivative or collateral claims meritless *ab initio.*

actually opened the door, the officers did not forcibly enter Carr's office.[8]

Next, and most significantly, the video shows indisputably that neither officer ever brandished a firearm. Carr testified during his deposition that the officer who entered his office was holding both a flashlight and a firearm at the time he entered, with the firearm in his right hand. (Dkt. No. 38-1, p. 159:16-18). That could not be Officer 1 because the video shows that he stepped back after the door was opened, remained visible at all times, and never brandished a firearm during the encounter. It also could not be Officer 2 because the video shows that he was holding a lit flashlight in his right hand as he approached Carr's threshold, not a firearm, and for that matter also did not have anything in his left hand.

At his deposition, Carr's counsel showed Carr the portion of the video where Officer 2 walks up to his office door. (*Id.* at pp. 158:17-159:11). Carr pointed out that Officer 2 was holding something in his right hand but was unable to identify what it was. (*Id.* at p. 159:5-7). Three questions later, having just watched the video, Carr testified that he thought (at the time of his deposition) that Officer 2 was holding a firearm in his right

---

[8] Carr concedes that there was no damage to the door or lock following the encounter but suggests that "[e]ither the lock failed under [the officers' and Grace's] assault or they had a spare key." Again, though, the video belies this assertion where it shows that no officer used a key or exerted any meaningful effort to open the door.

hand.  (*Id.* at p. 159:16-18).  Given Carr's repeated testimony
that Officer 2 wielded a firearm and a flashlight at the same time,
(*id.* at p. 159:12-15), this would mean that the officer held a
firearm in his right hand and a flashlight in his left hand.  In
fact, the portion of the video Carr reviewed during his deposition
clearly shows that Officer 2 held a flashlight -- not a firearm -
- in his right hand, and nothing in his left hand.

It is true that Officer 2's torso was partially obscured for
several seconds once he reached and leaned in towards Carr's
office, possibly allowing for speculation as to whether he
brandished a firearm during that time out of view of the camera.[9]
However, unsupported speculation cannot save Carr's claim in light
of his own testimony.  Per his deposition, Carr's claim in this
case is that Officer 2 pointed a firearm at him as he approached
Carr's office, something the video soundly refutes.  (*Id.* at pp.
62:19-63:1; 159:12-160:5).  By contrast, Carr does not contend
that Officer 2 entered his office first and thereafter pulled out
a firearm.  Accordingly, the fact that the video does not
definitively show what Officer 2 may have done once he leaned
inside the doorway is of no import where the video shows that he
did not have a firearm in either hand leading up to that point.

---

[9] To be clear, nothing in the video suggests that Officer 2 drew or brandished
a firearm while leaning into Carr's office.  To the extent that the officer's
body remains visible, none of his movements are consistent with drawing a
firearm.

On this record, no reasonable juror could find that an officer forcibly entered Carr's office or pointed a weapon at him.  Indeed, the video affirms that no officer committed either act.  It follows that the officers did not violate Carr's Fourth Amendment and they therefore are entitled to summary judgment on Count One.

Consequently, no protracted discussion is necessary as to the Town and Chief of Police; they too are entitled to summary judgment on Count One where the officers did not violate Carr's rights. *See e.g., Evans v. Avery*, 100 F.3d 1033, 1040 (1st Cir. 1996) (municipality cannot be held liable absent a constitutional violation by its officers).

**B.   Count Two - Assault**

Count Two alleges common law assault.  Under Massachusetts law, an assault is "an act which puts another in reasonable apprehension of imminent harmful or offensive contact, that is, an attempted battery or an immediately threatened battery." *Conley v. Romeri*, 806 N.E.2d 933, 939 n.6 (Mass. 2004) (citing Restatement (Second) of Torts § 21 (1965)).  For attempted battery assault, the defendant must have attempted to cause physical harm to the victim. *Commonwealth v. Gorassi*, 733 N.E.2d 106, 110 (Mass. 2000). For threatened battery assault, the defendant must have engaged in "objectively menacing" conduct with the intent to cause apprehension of imminent physical harm. *Id.*

13

Principally for the reasons discussed above, all defendants are entitled to summary judgment on Count Two. In light of the video, no reasonable juror could find that anyone engaged in any conduct that might reasonably put Carr in apprehension of imminent harmful or offensive contact.[10]

### C.   Count Three - Trespass

Count Three alleges common law trespass. Under Massachusetts law, a claim of trespass requires the plaintiff to show (1) actual possession of the property at issue and (2) an unlawful entry by the defendant, that is, an intentional entry onto the property without permission or privilege. *See Fed. Ins. Co. v. Bos. Water & Sewer Comm'n*, 583 F. Supp. 2d 225, 229 (D. Mass. 2008). There is no dispute that Carr was in possession of the property at issue.

As it relates to whether either officer entered Carr's property unlawfully, the video footage shows that Officer 2 may have briefly leaned into the threshold area of Carr's office. Such a *de minimis* intrusion into Carr's office could potentially constitute a trespass. *See Strecker v. Tavares*, Nos. 04SBQ20774G5001, DUCV200200044, 06MISC330647, and DUCV200700011, 2008 WL 1868415, at *51 (Mass. Super. Ct. Feb. 22, 2008) ("[T]hose fence posts installed by Tavares/Sutula located on the Streckers'

---

[10] Independently, Count Two would fail against the Town because the Massachusetts Tort Claims Act immunizes public employers from the intentional tortious acts of their employees. M.G.L. c. 258, § 10(c); *FBT Everett Realty, LLC v. Mass. Gaming Comm'n*, 187 N.E.3d 373, 389 (Mass. 2022).

property, no matter how minimal the intrusion, constitute a trespass."). Even so, summary judgment is still appropriate because, assuming an entry occurred, Officer 2 would enjoy common law immunity for his conduct.

Under Massachusetts law, "a public official, exercising judgment and discretion, is not liable for negligence or other error in the making of an official decision if the official acted in good faith, without malice, and without corruption." *Nelson v. Salem State College*, 845 N.E.2d 338, 348 (Mass. 2006); *see Tobin v. Goggins*, 459 N.E.2d 835, 836 (Mass. App. Ct. 1984) (common law immunity protects public official from liability "unless actions were done in bad faith, maliciously, or corruptly") (citation omitted)). In determining whether an officer acted with malice, the court takes "every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare." *S. Bos. Betterment Tr. Corp. v. Bos. Redevelopment Auth.*, 777 N.E.2d 812, 820 (Mass. 2002) (citation omitted).

Based on the record, the court finds the officers were exercising good faith discretion as public officials in responding to a call from a security guard in the middle of the night. The record shows that the officers limited their interaction with Carr to what was necessary in response to Grace's call, and that Officer 2 only leaned over the threshold of Carr's office as part of his

legitimate questioning of Carr, who was seated inside his office. Carr himself agreed that "as soon as the officers made a determination that there was no crime being committed and that [Carr was] entitled to be on the property, they left [Carr] alone and went on about their shift[.]" (Dkt. No. 38-1, p. 67:11-16). Summary judgment is therefore appropriate on this claim.

### D.   Count Four – Negligent/Intentional Infliction of Emotional Distress

Count Four alleges negligent and/or intentional infliction of emotional distress (NIED and IIED).  To prevail on a claim for NIED, a Massachusetts plaintiff must show: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." *Payton v. Abbott Labs*, 437 N.E.2d 171, 181 (Mass. 1982). A plaintiff alleging IIED must show: "(1) that [the defendant] intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." *Bettencourt v. Town of Mendon*, 334 F. Supp. 3d 468, 487 (D. Mass. 2018).

For the reasons discussed above, no reasonable factfinder could conclude on this record that any officer acted negligently, or in an extreme and outrageous manner, or engaged in any conduct

that was likely or intended to inflict emotional distress on Carr.
Summary judgment will therefore enter on this claim.

**VI.**   **<u>CONCLUSION</u>**

For the reasons stated above, the defendants' motion for
summary judgment on all counts is GRANTED.

<u>/s/ Donald L. Cabell</u>
DONALD L. CABELL, U.S.M.J.

DATED:  January 11, 2024